UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
GREENEVILLE

JOSHUA S. DEPACE )
 )
V. ) NO. 2:13-CV-328
 )
CAROLYN W. COLVIN, )
Acting Commissioner of Social Security )

MEMORANDUM OPINION

This matter is before the United States Magistrate Judge upon the consent of the parties for final disposition. Both the plaintiff and the defendant Commissioner have filed Motions for Summary Judgment [Docs. 13 and 15]. Plaintiff's application for Supplemental Security Income was administratively denied following a hearing before an Administrative Law Judge ["ALJ"].

The sole function of this Court in making this review is to determine whether the findings of the Commissioner are supported by substantial evidence in the record. *McCormick v. Secretary of Health and Human Services,* 861 F.2d 998, 1001 (6th Cir. 1988). "Substantial evidence" is defined as evidence that a reasonable mind might accept as adequate to support the challenged conclusion. *Richardson v. Perales*, 402 U.S. 389 (1971). It must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the jury. *Consolo v. Federal Maritime Commission*, 383 U.S. 607 (1966). The Court may not try the case *de novo* nor resolve conflicts in the evidence, nor decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if the reviewing court were to resolve the factual issues differently, the Commissioner's decision must stand if supported by substantial evidence.

*Liestenbee v. Secretary of Health and Human Services,* 846 F.2d 345, 349 (6th Cir. 1988). Yet, even if supported by substantial evidence, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2007).

The plaintiff is now 36 years of age. He was in special education classes throughout school, beginning in Kindergarten (Tr. 144). There is a dispute as to whether his attempts at employment rose to the level of "past relevant work."

Plaintiff bases his claim primarily upon his assertion that he meets the requirements of 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.05C, one of the Listings of Impairments, meaning he maintains he is disabled as matter of law at Step Three of the sequential evaluation process. Listing 12.05 which deals with "intellectual disability" contains an introductory paragraph which states "intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." It also contains four exclusive circumstances, A through D, which would show the required level of severity. 12.05C is the circumstance at issue in plaintiff's case, and requires "a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 12.00A, which describes the various specific mental listings when talking about Listing 12.05C, states that "if your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your

2

impairment meets the listing." Thus, plaintiff must show (1) subaverage intellectual functioning combined with deficits in adaptive functioning originating before age 22, *and* (2) in his case, an IQ score of between 60 and 70, *and* (3) an additional and significant limitation of function. This last requirement of "an additional and significant work-related limitation of function" is referring to the presence of a severe mental or physical impairment besides the subaverage intellectual functioning. *See*, §12.00A.

Plaintiff's medical history is summarized by his counsel as follows:

> On March 17 and 20, 1992, at the age of eight, Plaintiff was administered a psychological evaluation at the request of the Amphitheater Public School (Tr. 278-284). The specific testing used included the Wechsler Intelligence Scale for Children - Third Edition (WISC-III) and the Vineland Adaptive Behavior Scale. On the WISC-III, Plaintiff was found to have a verbal IQ of 60, Performance IQ of 68, and a Full Scale IQ of 61 (Tr. 283). Plaintiff adaptive skills and visual motor skills were noted as commensurate with mentally deficient range (Tr. 282). On the Vineland, Plaintiff's scores were noted as falling within the mentally deficient range (Tr. 282). The evaluator felt that these results were a valid indication of Plaintiff level of functioning at that time (Tr. 284).
>
> On October 12, 1994, at the age of eleven, Plaintiff was again administered a psychological evaluation (Tr. 269-277). Plaintiff was again given the WISC-III and a Vineland. On the WISC-III, Plaintiff was found to have a verbal IQ of 48, a performance IQ of 65, and a full scale IQ of 53 (Tr. 272). On the Vineland Social Maturity Scale, Plaintiff was found to be functioning at the age equivalency of three years and one month in the categories of communication and socialization (Tr. 273). The age equivalency in daily living skills was noted as seven years and five months and the category of composite was four years and six months (Tr. 273). The examiner noted "In the opinion of the diagnostician, the test scores obtained were valid estimates of Joshua's skill levels" (Tr. 272).
>
> On March 3, 2008, at the request of the Vocational Rehabilitative Services, Plaintiff underwent a psychological evaluation (Tr. 215-220). The evaluation procedures included a clinical interview, mental status evaluation, Vineland-II adaptive behavior scales, and a Wechsler Adult Intelligence Scale-III(WAIS-III). The Vineland adaptive behavior scale was noted as being completed on April 1, 2008, after the other procedures (Tr. 215). The overall behavioral observations of the examiner included the statement "Joshua was cooperative and displayed good effort" (Tr. 215, 218). The WAIS-II testing revealed a verbal IQ of 71, a performance IQ of 75, and a full scale IQ of 70 (Tr. 217). Following the completion of the Vineland-II, the examiner noted "His general level of adaptive functioning is low" (Tr. 218). This examiner further states "According to the professional guidelines (AAMR expert consensus, DSM-IV, and APA Division 33),

3

Joshua's Vineland-II results and his reported IQ score suggest a classification of mild mental retardation" (Tr. 218). At the conclusion of this report the examiner states "Joshua does appear to have a mental impairment which results in substantial impediment to employment; can benefit from Vocational Rehabilitation Services; and Joshua will require Rehabilitation if he is to gain and retain employment" (Tr. 219). The examiner further notes "Joshua meets criteria for mental retardation, mild, with a Full Scale IQ below 75 and with Adaptive Functioning based on the Vineland-II below age expected level" (Tr. 219). Still further the examiner states "Additionally, Joshua is (a) unable to operate a motor vehicle as he does not have a license and may be unable to use public transportation even if available; (b) has limited ability to set vocational goals or choose realistic/appropriate employment, and lacks job seeking skills; (c) has limited social skills and is below age level in social skills; (d) has had minimal work experience and minimal marketable skills" (Tr. 219).

On April 19, 2012, Plaintiff was seen for an initial evaluation at Frontier Health (Tr. 222). During this initial evaluation, Plaintiff reported some symptoms of depression and anxiety with, what the evaluator described, as possible panic features (Tr. 222). Plaintiff further indicated issues with concentration and focus (Tr. 222). Following this evaluation, Plaintiff diagnoses included major depressive disorder, described as moderate and recurrent, and generalized anxiety (Tr. 223). Plaintiff was given a prescription for Celexa 20 mg (Tr. 223). Plaintiff returned to this location for follow up on May 24, 2012 (Tr. 221). Plaintiff reported the medication was helping some with sadness (Tr. 221). Instructions were given to continue working with case manager and/or therapist (Tr. 221). Plaintiff returned on July 19, 2012 and reported that he was doing well (Tr. 225). Plaintiff indicated that he preferred to take the Celexa at bedtime because it seemed to help him rest.

On October 10, 2012, at the request of the Disability Determination Services (DDS), Plaintiff was evaluated by Dr. John Johnson (Tr. 241-243). The purpose of this examination was to determine the extent of Plaintiff's visual condition. Following examination, Plaintiff was found to have visual acuity of 20/100 OD and 20/70 OS (Tr. 241). Plaintiff's best corrected vision was 20/30 OD and 20/25 OS with significant myopia and astigmatism (Tr. 241). The impression was given as myopia and astigmatism (Tr. 241).

Plaintiff was seen at the Church Street Pavilion, Frontier Health, on October 11, 2012 (Tr. 267). The diagnosis included major depressive disorder recurrent severe (Tr. 267). Plaintiff reported some residual depression which resulted in an increase dosage of Celexa being ordered (Tr. 267). Additionally, some abnormal mannerisms were noted by this source (Tr. 267). Plaintiff further indicated that his mood was up and down (Tr. 268). Plaintiff returned to this location on January 10, 2013 (Tr. 266-267). Plaintiff was reported as being stable at this time with the diagnosis of major depressive disorder recurrent severe being maintained (Tr. 266). On April 4, 2013, Plaintiff returned again and reported that the Celexa was causing him to be tired and sleepy (Tr. 265). The mental status portions of these notes indicate that Plaintiff made little to no eye contact, had some abnormal mannerisms, and affect being blunted (Tr. 265). Plaintiff also reported his mood as being "on and off" and having some difficulty with concentration (Tr. 265).

4

[Doc. 14, pgs. 2-5].

With respect to the findings of examining ophthalmologist Dr. Johnson, Dr. Randall, a state agency ophthalmology consultant, reviewed Dr. Johnson's examination notes and opined that plaintiff did not have a severe visual impairment (Tr. 245).

The evaluations of the state agency mental health consultants is accurately described by the Commissioner as follows:

> In connection with Plaintiff's initial claim, Dr. Kupstas, a state agency mental health consultant, reviewed Plaintiff's medical records (Tr. 49-53). Dr. Kupstas found that Plaintiff's severe impairments were borderline intellectual functioning and affective disorder and opined that Plaintiff was able to remember and carry out at least simple instructions and most likely low level detailed instructions, could maintain concentration, persistence, and pace for at least simple tasks and most likely low-level detailed instructions over a normal workday with appropriate breaks, had no social limitations, and was able to adapt to routine/infrequent changes in the workplace (Tr. 50, 52-53). In connection with Plaintiff's claim on reconsideration, Dr. Dubois, a state agency mental health consultant, reviewed Plaintiff's medical records (Tr. 71-75). Dr. Dubois found that Plaintiff's borderline intellectual functioning, affective disorder, and loss of visual acuity did not constitute a severe impairment and opined that Plaintiff was able to understand, remember, and perform simple and lower-level detailed tasks, could not make independent decisions at the executive level, could maintain concentration, persistence, and pace for simple tasks and lower-level detailed tasks with customary breaks, had no social limitations, could set limited goals, and was able to adapt to infrequent changes in the workplace (Tr. 71, 73-75).

[Doc. 16, pg. 4].

The administrative hearing on July 19, 2013 lasted only 15 minutes and is 11 pages long (Tr. 28-38). Plaintiff had originally also filed a claim for disability insurance benefits, but abandoned that claim in front of the ALJ by amending his claimed disability onset date to April 6, 2012 (Tr. 28). The ALJ immediately called a Vocational Expert, Ms. Donna Bardsley, to categorize plaintiff's prior jobs, which she identified as "laborer" which was light and unskilled. When asked if there were other jobs which a person who could not read

5

or write could perform besides as a laborer, Ms. Bardsley identified some factory jobs and stated there were 7,000 such jobs in the region and 5 million in the national economy (Tr. 29-30).

The ALJ then told the plaintiff's attorney what he envisioned the issues as being. He told him "we've got two issues here, whether this is a 12.05C, which is not a popular listing. It draws a lot of attacks. The the other one is, even if you didn't have the listing...there should be jobs for people who can't read and write. So, just kind of try to explain why he couldn't be a laborer or work in a factory, okay?" (Tr. 30).

Counsel pointed to the school records, the IQ test scores, and Ms. Abbott's assessment (Tr. 30-31). Counsel then examined the plaintiff about the difficulties he had attempting to work in the past, his daily schedule and activities, and the difficulties he experiences (Tr. 31-35). Ms. Bardsley then opined that most of the jobs she identified could be performed by plaintiff even without fine visual acuity. She also opined that if he required additional supervision for task completion, there would be no jobs. (Tr. 35-37).

In his hearing decision, the ALJ found that the plaintiff had a single severe impairment, mild mental retardation (Tr. 13). He found that the plaintiff did not have any severe impairment with his corrected vision (Tr. 13-14).

He then addressed the issue of plaintiff's depression. He stated that plaintiff's depression was "generally" doing well with medications. He stated that "the record does not indicate that it has resulted in any ongoing limitations for any twelve consecutive months." Treatment began at Frontier Mental Health in April of 2012 with a prescription for Celexa. Plaintiff had not been hospitalized for depression. The ALJ stated that plaintiff's reported

6

daily activities did not indicate that he was severely impaired by depression. In this regard, the ALJ stated the plaintiff "watched television, got on the computer, checked his e-mail, played games, and looked on E-bay, mowed, cared for his dog, fed the animals, had no problems with personal care, swept, vacuumed, made his bed, went to the mall, went to church, went to antique stores, went to the flea market, spent time with his family, went out to eat, made simple foods including frozen pizza, macaroni and cheese, and roman noodles [sic], could use a stove and microwave, trim bushes, did most household chores, shopped, rode a bike, and walked." (Tr. 14).

Having determined that the plaintiff's visual difficulties and depression were not severe impairments, the ALJ proceeded to evaluate whether the plaintiff met or equaled one of the Listings. The ALJ went into considerable detail discussing why the plaintiff did not meet other Listings, such as 12.04, which is the Listing for depression, and 12.05A,B and D. In discussing these, he opined that the plaintiff had mild restrictions of activities of daily living and social functioning, but had marked difficulties of concentration, persistence or pace. To meet Listing 12.04 or 12.05D, a person must have marked difficulties in two of those areas. Turning again to 12.05C, the ALJ stated that while the plaintiff met the IQ score requirement, "the record does not show evidence" of another severe physical or mental impairment. (Tr. 14-16).

The ALJ then found that the plaintiff had the residual functional capacity to perform the full range of work at all exertional levels, but that he was limited to unskilled jobs (Tr. 16). He once again stated that plaintiff had met the IQ score requirement for "mild mental retardation," and was therefore limited to unskilled jobs. He then found that the plaintiff was

7

not completely credible, again citing his daily activities (Tr. 17). He gave great weight to the state agency psychologists, but little weight to Frontier Health, which opined that the plaintiff had a GAF of 55, and little weight to the consultative examiner Donna Abbott who opined a GAF of 50. His basic reason for disagreeing with Ms. Abbott was because it would be inconsistent with plaintiff's activities of daily living and because that GAF would be "consistent" with a severe impairment in social or occupational functioning" which of course would mean the plaintiff would meet Listing 12.05C. (Tr. 18).

Based upon all of this, the ALJ found that the plaintiff could return to his past relevant work as a laborer. Accordingly, he was found to be not disabled. (Tr. 19).

Plaintiff first asserts that the ALJ erred in failing to find that he meets the requirements of Listing 12.05C, described above. It is undisputed that plaintiff meets the necessary IQ score requirement. Plaintiff states that evidence exists that he has "additional and significant work-related limitation(s) of function" by having shown that he has depression, anxiety, and vision problems which the ALJ erroneously held were not "severe." Plaintiff points out that under the applicable regulation at 20 C.F.R. § 416.991 "an impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."

The Sixth Circuit, from time immemorial, has held that "the step two severity regulation...has been construed as a *de minimis* hurdle in the disability determination process...Under the prevailing *de minimis* view, an impairment can be considered not severe **only** if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience. *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). *citations*

8

*omitted.* The *de minimis* standard exists to allow "the threshold dismissal of claims obviously lacking medical merit." *Id.* "The purpose of the second step of the sequential analysis is to enable the Commissioner to screen out 'totally groundless claims.'" *Griffith v. Commissioner of Social Security*, 217 F. App'x 425, 428 (6th Cir. 2007), quoting *Farris v. Sec'y of HHS*, 773 F.2d 85, 89 (6th Cir. 1985).

Here, the plaintiff has been diagnosed with major depressive disorder at Frontier Health. The Commissioner asserts that since the plaintiff saw only nurses during his visits, and since nurses are not acceptable medical sources, the diagnosis is immaterial. However, at least with respect to the visit at which he saw Nurse Boggs on May 24, 2012, the note indicates that it was reviewed by the staff psychiatrist (Tr. 224). The drug Celexa was prescribed and the dosage increased on October 11, 2012 (Tr. 267). The nurses may not be acceptable medical sources, but the recurring treatment and the prescription of anti-depressants supports the diagnosis. In the opinion of the Court, the records of this treatment which continued for over a year until the record was closed satisfied the requirement of meeting the *de minimis* standard. This is further supported by the opinion of state agency psychologist Frank Kupstas, who opined that the plaintiff's depression was severe.

In the context of steps four and five of the evaluation process, having a severe impairment, or even multiple severe impairments, by no means indicates an entitlement to benefits. A person's RFC may allow a person to return to a past relevant job, be "not disabled" under the Medical-Vocational Guidelines, or cause a vocational expert to opine that a significant number of jobs exist.

However, the listings, particularly Listing 12.05C, establish disability as a matter of

law. If a person isn't working and meets the criteria of a listing, then they are entitled to benefits. The inquiry is not about residual functional capacity at all, but an almost formulaic concept of per se disability.

The ALJ plainly stated his dissatisfaction with Listing 12.05C (Tr. 30), and this Court can certainly understand his feelings in that regard. There are no doubt numerous people engaged in substantial gainful activity who would meet one of the listings, including Listing 12.05C, but choose to work rather than apply for benefits. But the listings have the effect that they have, for good or ill.

Plaintiff must of course meet the "introductory paragraph" requirement of "deficits in adaptive functioning initially manifested...before age 22." The plaintiff comes across throughout the record as a good natured person, even enthusiastic, and as a person who would very much love to work. In fact, he told the examiner with the vocational rehabilitation examiner that he "wanted to do 'any job I can do.'" However, he was placed in special education classes from Kindergarten until his formal education ended in the 10th grade. His parents have raised him well, and provided a nurturing environment. In the case of such a person, the reported activities of daily living appear to be a less effective gauge with which to measure the level of impairment than his actual inability to remain employed at even the simplest of jobs.

The Court agrees that the plaintiff has not shown a severe vision impairment. However, it appears to the Court that the plaintiff has shown that he meets all criteria of Listing 12.05C. It is therefore ORDERED that the case be remanded to the Commissioner for an award of supplement security income benefits.

ENTER,

    s/ Dennis H. Inman
United States Magistrate Judge